TIMOTHY COURCHAINE
United States Attorney
District of Arizona
NATHANIEL J. WALTERS
JENNIFER H. BERMAN
Assistant United States Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
nathaniel.walters@usdoj.gov
jennifer.berman@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>David Berry Garmarnik,<br>Defendant. | CR-24-08214-RM-MSA<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

This case exposes conduct that is as deliberate as it is depraved. For nearly a decade, the defendant, recently diagnosed with pedophilic disorder and fully aware of his deviant sexual interest in children, chose to act on that interest by financing, directing, and consuming the sexual exploitation of minors around the world. His diagnosis is not an explanation; it is an aggravating factor. It underscores that his criminal behavior was not a momentary lapse or a misguided impulse, but a sustained pattern rooted in a deeply entrenched sexual attraction to children, which was an attraction he repeatedly indulged rather than controlled. The result was real-time harm inflicted on real children, many of them far too young to understand the abuse being orchestrated for paying offenders like the defendant. The defendant's choices reveal a level of moral bankruptcy and dangerousness that demand a substantial sentence. For all the reasons listed herein, the United States respectfully requests a sentence of 240 months' imprisonment.

///

## I. FACTUAL AND PROCEDURAL HISTORY.

On July 16, 2024, Homeland Security Investigations (HSI) Tucson received a request from HSI Portland, Maine, regarding the subject of a child exploitation investigation, David Berry Garmarnik, believed to be residing in Tucson, Arizona. The investigation related to Skype user *flashjack78* was later identified as belonging the defendant. The defendant's account was identified during analysis of information obtained via search warrants from Skype (owned by Microsoft). Specifically, communications between a Philippine National and the defendant were indicative of child sex trafficking and possibly live streaming. The defendant had chat conversations with 11 known or suspected trafficker accounts between April 29, 2017, and September 11, 2022.

Following a subpoena to Skype/Microsoft, HSI Special Agent (SA) Chad Lakosky learned that username *flashjack78* was utilizing Internet Protocol (IP) address 72.200.123.0, which came back to Arizona. A second summons was sent to Skype/Microsoft on May 19, 2024, for information related to multiple accounts suspected of participating in livestream child sex shows, to include the defendant's account. Under the *flashjack78* username, the user logged in 10 times between May 5, 2024, and May 18, 2024, using IP address 72.212.100.190. A subpoena sent to Cox Communications showed the subscriber of that IP address to be the defendant with an address in Tucson, Arizona.

On July 17, 2024, SA Lakosky initiated subpoena requests for account holder and transaction details to prominent Money Service Business (MSB) providers for information linked to the defendant. 93 transactions were conducted via Western Union totaling $3,515. 80 of these transactions were to recipients in the Philippines that appeared to have no familial or known connection to the defendant. The most common amounts of money sent in the transactions ranged from $15 to $50, with a few transactions over that amount. This type of payment activity has been identified as indicia of suspected payment for livestream child sexual exploitation. SA Lakosky was also able to show that the same IP address used in the Skype records were used to send Western Union money orders. World Remit Corporation showed one payment of $40 to Olongapo, Philippines, on September 2, 2015.

The IP address of 72.208.136.84 was used by the sender and was also listed in the Western Union transactions for the defendant between September 4, 2015, and November 28, 2015. Finally, PayPal showed a total of $560.25 with 14 transactions going to recipients in the Philippines that appeared to have no familial or known connection to the defendant. The most common amounts of money sent in the transactions ranged from $15 to $50, with a few transactions over that amount. This type of payment activity has been identified as indicia of suspected payment for livestream child sexual exploitation.

On June 19, 2019, the defendant sent a payment of $28.87 to a subject listed as Ana Marie MORALDE in the Philippines. Moralde was positively identified in an HSI investigation as a trafficker offering sexually explicit live webcam shows involving underage children in exchange for cash remittances in Bulacan, Philippines. Moralde was arrested on September 15, 2022, by HSI agents and Philippine law enforcement for violations of Philippine law pertaining to Anti-Trafficking in Persons Act and Child Abuse all in relation to the Cybercrime Prevention Act. During the arrest operation, authorities rescued four children directly tied to Moralde whose ages ranged from two (2) to fifteen (15) years old.

On September 16, 2024, after obtaining a search warrant, SA Lakosky received an enormous about of data from Microsoft. Microsoft records showed that between April 23, 2017, through August 13, 2024, the defendant had exchanged 104,21 messages, 1,629 medial files, and 1,482 call records. Hundreds of chat conversations containing suspected activity indicative of the exchange of child sexual abuse material (CSAM) and livestream child sexual abuse shows was present.

On October 22, 2024, at approximately 6:04am, HSI SAs from Tucson executed a search warrant at the defendant's residence. The announcements to exit the residence went unanswered for over four minutes before SAs breached the front door. At approximately 6:27am, SAs arrested the defendant on a complaint, and during a post-*Miranda* interview, the defendant made a full confession. Specifically:

- When asked why he believed agents would be at his house, the defendant stated he had "no idea";
- When asked if he had ever downloaded or possessed CSAM, the defendant admitted he had not purchased it, but had downloaded and deleted it;
- The defendant stated he had done it "a couple of times" and said that he downloaded the material after "just seeing it on the web";
- When asked about his Skype account, the defendant stated he deleted his Skype account but couldn't remember when he deleted it or his username;
- The defendant claimed to have had his Skype account for approximately one year;
- When confronted with inconsistencies, the defendant stated he was talking to "a lady from the Philippines" and said he would send money because she had problems;
- When asked about live sex shows with children, the defendant admitted he had done about 100, but that he had not done one of those in a while;
- The defendant confirmed his Skype account was *flashjack78*;
- The defendant denied being 'hands on' with a child;

The defendant said he's never traveled to the Philippines.

On November 20, 2024, the United States obtained a federal indictment against the defendant. (Doc. 18.) The indictment included 20 counts of Attempted Production of Child Pornography, in violation of 18 U.S.C. §§ 2251(a) and (e), 20 counts of Attempted Coercion and Enticement, in violation of 18 U.S.C. § 2422(b), and 5 counts of Receipt of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). *Id*.

On May 12, 2026, the defendant pleaded guilty to Count 3 of the Indictment, which charged the defendant with Attempted Production of Child Pornography. (Doc. 51.) In the plea agreement, the defendant agreed to serve a sentence of 180-240 months in federal prison followed by lifetime supervised release. *Id*. Sentencing is currently scheduled for October 14, 2026, before the Honorable Judge Rosemary Marquez. (Doc. 54.)

## II. CONCURRENCE WITH PSR GUIDELINE CALCULATIONS.

The United States agrees with the calculations as stated in the PSR, dated September 3, 2026. (Doc. 56 at ¶¶ 34-46.) The United States also has no objection to the PSR's finding that the defendant falls into Criminal History Category I. (Doc. 56 at ¶¶ 50-51.) The United States respectfully requests that this Court sentence the defendant to a term of 20 years' imprisonment followed by a term of lifetime supervised release.

## III. UNITED STATES SENTENCING POSITION

This case is not simply about online chats, remittances, or digital records. This case is about a man who chose (repeatedly and over many years) to finance, direct, and consume the sexual exploitation of vulnerable children on the other side of the world. His actions fueled an international trafficking marketplace in which children, some as young as two years old, were abused in real time for buyers like the defendant. These were not isolated lapses in judgment. There were deliberate choices that helped sustain a criminal industry built entirely on the suffering of children.

Even after being confronted with overwhelming evidence, and even after acknowledging certain aspects of his conduct, the defendant persisted in minimizing his actions, offering shifting explanations, and denying responsibility for the full extent of the harm he caused. His admissions and guilty plea, when finally made, only underscored the years of deception, the breadth of his involvement, and the devastating reality that he knowingly paid traffickers to produce and live-stream the abuse of minors for his sexual gratification. His conduct reflects a disturbing willingness to exploit the most vulnerable children imaginable and a profound indifference to their humanity.

The Court must impose a sentence that reflects the staggering gravity of the defendant's role in this international child-trafficking enterprise. His actions were not passive, accidental, or peripheral. His actions were purposeful, persistent, and indispensable to the abuse he financed. The defendant's conduct is so deeply immoral, unethical, and destructive that it strikes at the very fabric of civilized society. In light of the seriousness of the offenses, the need for just punishment, the protection of the public,

and the other factors set forth in 18 U.S.C. § 3553(a), a sentence of 240 months' imprisonment is both warranted and necessary.

## Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of these offenses are extraordinarily aggravating. For nearly a decade, the defendant chose to participate in a global industry built entirely on the sexual exploitation of vulnerable children. He did not act impulsively or stumble into criminal activity. Instead, he sought out traffickers, paid them repeatedly, directed the abuse of children in real time, and consumed the resulting sexualized content. His conduct directly supported an international trafficking network that profits by subjecting children, some as young as toddlers, to live-streamed abuse for paying offenders around the world. The defendant was not a passive observer. He was an active and willing participant whose money and directives helped fuel and sustain the exploitation.

The defendant's behavior was deliberate, calculated, and persistent. The evidence reflects years of communications with known and suspected traffickers, more than a hundred remittances to individuals in the Philippines who had no legitimate connection to him, and extensive engagement in live-streamed child sexual abuse shows. His own admissions during his post-arrest interview confirm that these were not isolated instances, but repeated acts of sexual exploitation that he sought out and paid for. Even when confronted by investigators with his digital footprint, the defendant initially minimized, deflected, and attempted to distance himself from his conduct. Only when pressed did he acknowledge the breadth of his involvement including his admission that he had engaged in approximately one hundred live shows involving children.

The harm inherent in these offenses is immeasurable. The children exploited in the live-stream shows financed by the defendant suffered real, immediate, and lasting trauma. Their abuse did not occur in isolation. Their abuse was orchestrated for paying offenders like him. This defendant's actions directly contributed to the continued victimization of

those children and the expansion of the trafficking networks that profit from their suffering. These are not hypothetical harms. They are concrete, devastating consequences inflicted on real children whose lives have been permanently altered.

The defendant's conduct reveals a level of moral bankruptcy that cannot be overstated. A person who is willing to pay for, direct, and repeatedly seek out the sexual exploitation of children, children he has never met, children living in poverty, children whose only "value" to him was their availability for abuse, is someone who has fundamentally abandoned the most basic tenets of decency and humanity. His actions were not driven by desperation, coercion, or impaired judgment. They were driven by choice. Over and over again, he chose to fund traffickers, to perpetuate the victimization of vulnerable children, and to satisfy his own desires at the expense of their suffering. That sustained willingness to exploit the most defenseless members of society demonstrates a profound defect in moral character and a disturbing disregard for the lives and dignity of others. The defendant's choices, his repeated funding of traffickers, his active involvement in live-streamed abuse, and his persistent attempts to hide the truth demonstrate a level of moral culpability that is profound. Under § 3553(a), the gravity of the offense, the need to protect the public, and the seriousness of the harm all strongly support a substantial sentence.

<u>The Need for the Sentence to Reflect the Seriousness of the Offense,<br>to Promote Respect for the Law, and to Provide Just Punishment</u>

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring). Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)). In the same vein, Congress

has expounded that the "just deserts" concept in sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense." S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59.

The § 3553(a)(2) factors overwhelmingly support a substantial custodial sentence in this case. The sentence must reflect the extraordinary seriousness of the defendant's conduct, promote respect for the law, provide just punishment, deter others, protect the public, and ensure the defendant receives appropriate treatment and long-term supervision. 18 U.S.C. § 3553(a)(2).

First, the sentence must reflect the seriousness of the offense and provide just punishment. This defendant's conduct represents one of the most serious categories of federal criminal behavior: the knowing, repeated exploitation of children through the financing and consumption of live-streamed abuse. Over the course of years, the defendant used his money, time, and deliberate efforts to support traffickers who abused real children in real time for his sexual gratification. He maintained sustained relationships with known and suspected traffickers, sent more than one hundred payments to individuals in the Philippines, and engaged in roughly one hundred live child-exploitation shows. His conduct did not occur in a vacuum. It drove demand, emboldened traffickers, and directly contributed to the continued victimization of children whose suffering he viewed as entertainment. A crime of this magnitude demands a sentence that fully acknowledges its gravity. Anything less would diminish the severity of the offense and fail to promote respect for the law.

Second, the sentence must serve both general and specific deterrence. General deterrence carries enormous weight in child-exploitation cases because these offenses thrive on anonymity, secrecy, and offenders' belief that they can avoid detection. A substantial sentence is required to send a clear and unequivocal message. That those who finance, direct, or engage in the sexual exploitation of children, whether hands-on or through online trafficking platforms, will face severe consequences. Specific deterrence is equally important. Despite years of escalating involvement in child-exploitation networks,

and despite obvious warning signs inherent in the digital trails he created, the defendant continued undeterred. His persistence in this behavior, even after prior investigative scrutiny, demonstrates that only a significant term of imprisonment can meaningfully deter him from reoffending.

This Court's sentence must consider the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). When Congress passed the Protection of Children against Sexual Exploitation Act of 1977, it sought to address the organized, nationwide child pornography industry that was generating millions of dollars through the exploitation of children. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43. The Act, which included 18 U.S.C. § 2251, was aimed at filling a void in federal law by targeting the production of materials depicting child abuse. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 56. But the Act, and its later amendments, are more than prophylactic measures. They reflect value judgments and accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 43. Indeed, child sexual abuse "is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *See Kennedy v. Louisiana*, 554 U.S. 407, 468 ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting) (quoting C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990)).

The defendant's actions violated federal law, but they also transgressed every conceivable normative principle undergirding our laws. His conduct is repugnant to any conception of the good embraced by our community and is profoundly corrosive to the *homonoia* of our society. This Court's sentence must express an appropriate level of social condemnation of his crimes.

Third, the need to protect the public strongly favors a lengthy custodial sentence and lifetime supervision. The defendant's conduct, spanning nearly a decade, reveals deeply

ingrained patterns of predatory behavior and moral bankruptcy. A person who repeatedly pays to have children exploited and who seeks out traffickers, directs abuse, and funds the ongoing victimization of minors presents a serious danger to the community. Compounding that danger is the defendant's continued minimization and rationalization of his actions. Even when confronted with irrefutable evidence, he initially attempted to distance himself from responsibility and soften the truth of what he had done. Such minimization directly undermines rehabilitation and signals an elevated risk of recidivism. The Court must therefore impose a sentence that not only incapacitates the defendant for a substantial period but ensures intensive long-term supervision, monitoring, and treatment. Finally, the Court should consider the need to provide the defendant with appropriate correctional treatment. The record indicates that the defendant would benefit from structured mental-health and sex-offender treatment in a controlled environment. But these needs do not mitigate the profound harm caused by his conduct. Instead, they reinforce the necessity of a sentence that ensures the defendant receives the treatment, accountability-focused therapy, and supervision required to protect the public and address the risk he presents.

Ultimately, a substantial sentence is necessary because anything less would fail to reflect the seriousness of these offenses, fail to impose just punishment for the deliberate exploitation of children, fail to deter similar conduct by others, and fail to adequately protect the public from further harm.

<u>Victim Impact</u>

It is axiomatic that hands-on sexual abuse inflicts upon its victim enormous, devastating, and long-lasting harm. That the abuse is inflicted on a child adds a devastating dimension to the harm ordinarily inflicted on rape victims. As the Supreme Court explained while addressing an Eight Amendment challenge to capital punishment for the rape of a child by her stepfather in *Kennedy v. Louisiana*:

///

> […] the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood.... Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

554 U.S. at 435 (citing various studies). Those years of anguish can include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. *Id.* at 468 (Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting). Sexually exploited children also struggle to develop healthy affectionate relationships, they suffer from sexual dysfunctions, and they have a tendency to become sexual abusers themselves. *See New York v. Ferber*, 458 U.S. 747, 758 n. 9 (1982) (citation omitted). And this is to say nothing of the serious and sometimes long-lasting physical injuries that a rape can inflict on a child victim, such as internal lacerations, scarring, ovary damage, and encopresis. *See Irey*, 612 F.3d at 1207 (collecting cases).

Here, the defendant chose to contribute directly to that harm. By paying traffickers, soliciting access to videos and live shows, and repeatedly consuming the abuse of children broadcast for his benefit, the defendant became an essential participant in an international machinery of exploitation. Children were abused in real time because individuals like the defendant created the demand for such abuse. The trauma those children endure, many of them too young to comprehend or articulate what happened to them, will not disappear when the livestream ends or the screen goes dark. The abuse persists in the form of recordings and memories, and the knowledge that strangers across the world paid to watch their victimization. As the Supreme Court has noted, “the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.” *Ferber*, 458 U.S. at 759.

The defendant’s conduct also contributed to the victimization of the children rescued in connection with the traffickers he financed. One of the individuals he paid was

later arrested for offering livestreamed abuse of minor children, and four children, ages two through fifteen, were recovered during that operation. Those children were being exploited, in part, to satisfy the demands of offenders like this defendant. Their fear, their pain, their trauma, and the years of recovery they now face are inseparable from the ecosystem of abuse he chose to fuel.

And unlike a case involving a single illicit transaction or isolated download, the defendant's behavior spanned years. He engaged with suspected traffickers, sent more than one hundred payments, logged thousands of communications, and admitted to approximately one hundred live shows involving children. His conduct was not passive consumption. Instead, it was active participation in an abusive enterprise, it was purposeful, it was sustained, and it was morally bankrupt.

A substantial sentence is necessary to reflect the seriousness of the defendant's conduct, to honor the immense harm suffered by the children whose abuse he financed, and to reaffirm society's uncompromising commitment to protecting the most vulnerable from exploitation.

## IV. CONCLUSION.

The defendant's conduct represents one of the most serious and morally abhorrent forms of criminality confronted in federal court. For nearly a decade, he chose to involve himself in an international apparatus of child exploitation, an enterprise that exists only because offenders like him create the demand, fund the traffickers, and sustain the marketplace in which children are abused, recorded, and displayed for profit. His actions were not impulsive, momentary, or naïve. They were deliberate, repeated, calculated, and essential to the continued victimization of children who had no power, no protection, and no voice.

The defendant has demonstrated through years of sustained predatory behavior that he lacks the moral compass or internal restraints that could protect the public from future harm. His willingness to exploit the most vulnerable members of society for his own sexual gratification reflects a profound corruption of character and a chilling disregard for the

humanity of the children he helped victimize. Individuals who choose to finance and consume the sexual abuse of children do not merely observe suffering, they create it.

A sentence of 240 months' imprisonment is not only justified, it is necessary. Anything less would minimize the scope of his conduct, devalue the suffering of the children whose abuse he purchased, and undermine public confidence in the law's promise to protect the vulnerable and punish those who prey upon them.

The victims in this case, children whose abuse was broadcast to paying offenders across the world, will carry the consequences of the defendant's decisions for the rest of their lives. The law must speak with equal clarity and equal permanence. For these reasons, the United States respectfully requests that the Court impose a sentence of 240 months' imprisonment, to be followed by lifetime supervised release.

In addition, the United States also respectfully requests that the Court impost a $5,000 assessment under 18 U.S.C. § 3014(a). Under the statute, this assessment must be imposed unless the defendant is indigent. Finally, the United States asks that the Court follow the recommendation in the PSR and impose an additional $10,000 assessment under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018.

Respectfully submitted this 9th day of October 2026.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

s/ *Nathaniel J. Walters*
s/ *Jennifer H. Berman*

NATHANIEL J. WALTERS
JENNIFER H. BERMAN
Assistant United States Attorneys

Copy of the foregoing served electronically or by other means this 9th day of October 2026 to:

All ECF Participants